## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| JAMES TAYLOR | : | No. 20-cr-443-1 |

### MEMORANDUM

PRATTER, J.                                                                JULY 29, 2022

James Taylor moves to suppress drugs and a firearm recovered from his vehicle during a traffic stop as well as certain incriminating statements he made to law enforcement officers during the stop. Because the officers had reasonable suspicion to stop Mr. Taylor based on a number of traffic violations and had probable cause to search Mr. Taylor's vehicle based on his admissions and the smell of PCP coming from the vehicle, the officers' search did not violate the Fourth Amendment. Mr. Taylor also received *Miranda* warnings and implicitly waived his rights by answering the officer's uncoercive questions, so the questioning did not violate the Fifth Amendment and Mr. Taylor's incriminating statements are also admissible. Thus, the Court denies Mr. Taylor's motion to suppress in full.

### FINDINGS OF FACT

The Court held evidentiary hearings on the motion to suppress on February 3 and June 6, 2022. The Government presented a single witness, Trooper Galen Clemons of the Pennsylvania State Police, who recounted the events in question. The Government introduced several exhibits, including the Mobile Video Recording ("MVR") from the dashboard camera on Trooper Clemons's police vehicle. Mr. Taylor also called Trooper Clemons to testify, along with Trooper

Patrick Hamill, Trooper Andrew McWilliams, and himself. The Court finds the following facts based on the evidence presented at the evidentiary hearing.[1]

## I.   Mr. Taylor's Driving Prior to the Stop

Around 1:20 a.m. on May 3, 2020, Pennsylvania State Police Troopers Galen Clemons and Andrew McWilliams were driving northbound on Interstate 476 on patrol in a marked police vehicle. This road, known as the "Blue Route," is a three-lane limited access highway with a barrier between the northbound and southbound sides. Feb. 3, 2022 Hr'g Tr. ("Day 1 Tr.") at 24:18–25:13. There were few vehicles on the road at this hour.

Around mile marker 10, they saw James Taylor driving a black Dodge Ram truck in the left lane.[2] Day 1 Tr. at 25:14–26:9, 28:6–9. Soon afterwards,[3] Trooper Clemons clocked Mr.

---

[1] "On a motion to suppress evidence, the trial judge sits as the finder of fact" and "assess[es] the credibility of witnesses, weigh[s] the evidence," and draws any "inferences, deductions and conclusions" from the evidence. *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (quoting *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)); *Moore v. Monaghan*, No. 19-cv-4400, 2021 WL 39631, at *4 (E.D. Pa. Jan. 5, 2021).

Mr. Taylor raises two general challenges to Trooper Clemons's credibility. *First*, he argues that Trooper Clemons suffers from memory problems on late night shifts due to prior concussions. The Court finds that this does not affect Trooper Clemons's credibility, particularly given the MVR footage, which affirms his testimony about the events beginning just prior to the traffic stop.

*Second*, Mr. Taylor asks the Court to take judicial notice of the rejection of certain portions of Trooper Clemons's testimony in an unrelated case in this District. But a court may only take judicial notice of another court's opinion "for the existence of the opinion" and "not for the truth of the facts recited therein." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). The existence of another opinion addressing Trooper Clemons's credibility does not aid the Court as a factfinder in *this* case because determinations of credibility are episodic.

[2] The Court credits Trooper Clemons's testimony on the location where he and Trooper McWilliams first saw Mr. Taylor. Although Trooper McWilliams testified that they began following Mr. Taylor around mile marker 6 or 7, Trooper McWilliams also testified that he has changed police stations, no longer drives in the area, and was "a little bit fuzzy" about the precise mile markers of particular exits. June 6, 2022 Hr'g Tr. ("Day 2 Tr.") at 48:4–21. The Court credits Trooper Clemons's more-specific testimony but finds that both troopers credibly testified that they followed Mr. Taylor for several miles before initiating the traffic stop. Day 1 Tr. at 29:3-19; Day 2 Tr. at 55:24–56:3.

[3] Trooper Clemons testified that he pulled Mr. Taylor over 6 miles after checking his speed. Day 1 Tr. at 29:18–19. Because Trooper Clemons testified that the officers first reached Mr. Taylor's vehicle around mile marker 10, Day 1 Tr. at 25:17–18, and Mr. Taylor eventually stopped his vehicle around mile

Taylor driving 75 miles per hour in a 55 miles-per-hour zone. Trooper Clemons recorded this speed by Trooper McWilliams driving to match Mr. Taylor's speed for at least 0.3 miles and Trooper Clemons checking their vehicle's certified and calibrated speedometer. Day 1 Tr. at 27:5–28:5; 79:18–80:1; June 6, 2022 Hr'g ("Day 2") Tr. at 55:1–10.[4]

The troopers followed Mr. Taylor for several miles. Day 1 Tr. at 29:13–19; Day 2 Tr. at 55:25–56:1. During this time, they observed Mr. Taylor swerving within his lane, fluctuating speeds, and continuing to drive in the left lane despite the police vehicle following behind him. Day 1 Tr. at 30:9–23; 31:4–22.[5] Trooper Clemons testified that he viewed this behavior as indicating that Mr. Taylor was driving under the influence of alcohol or drugs. Day 2 Tr. at 21:9–18. Trooper Clemons testified that typically when a police vehicle pulls up behind a driver in the

---

marker 17, MVR at 1:24:58, this would mean that Trooper Clemons clocked Mr. Taylor's speed within the first mile of beginning to follow him. *See also* Def.'s Ex. 1, at 8.

[4] Mr. Taylor denies that he was speeding, but the Court finds his general denial in response to his own lawyer's leading, compound question about his driving behavior prior to the stop not credible. *See* Day 2 Tr. at 80:19–24. Mr. Taylor also argues that Trooper Clemons "change[d] his testimony about how fast the troopers were travelling, initially saying 50, then saying 75-80" "to justify the fact that he said [Mr. Taylor] was travelling 75 mph." Doc. No. 42, at 2. But Trooper Clemons also testified that Mr. Taylor fluctuated his speed throughout the time the troopers followed him.

Mr. Taylor also attempts to cast doubt on Trooper Clemons's testimony that he was speeding by arguing that Trooper Clemons did not cite him for speeding in the criminal complaint. Doc. No. 42, at 2. However, the criminal complaint does, in fact, list speeding as one of his offenses. Def.'s Ex. 1, at 27. The Court finds Trooper Clemons's testimony about Mr. Taylor's speed in excess of the speed limit to be credible.

[5] Mr. Taylor testified that he did not drive in the left lane for several miles, instead shifting to the left lane when he was "not far from [his] exit." Day 2 Tr. at 78:13–16. He testified that he shifted lanes only "a few moments" before Trooper Mitzak drove past him. *Id.* at 78:18–25. But the dash cam footage shows Mr. Taylor driving in the left lane from the very beginning of the video, which includes over 30 seconds before Trooper Mitzak drove past him, and another 50 seconds before the lights and sirens began. MVR at 1:23:24–1:24:10. There is no indication of a recent or upcoming left-lane exit that would have required Mr. Taylor to remain in the far-left lane. *Id.; see also United States v. Johnson*, No. 12-cr-70, 2015 WL 1444269, at *6 (W.D. Pa. Mar. 30, 2015), *aff'd*, 742 F. App'x 616 (3d Cir. 2018) (reviewing dashboard video and concluding that the footage did not support the defendant's asserted reason for being in the left hand lane). The Court finds that Mr. Taylor's testimony about a recent change to the left lane is not credible. Based on the video footage and the testimony of Trooper Clemons and Trooper McWilliams, the Court finds that Mr. Taylor remained in the left lane for several miles before the stop.

left lane of a multi-lane highway, the driver moves over to allow the officer to pass (unless there is traffic) even without the officer initiating his lights or siren. Day 1 Tr. at 31:23–32:4. Thus, Trooper Clemons testified that Mr. Taylor's failure to move from the far-left lane after the officers positioned their vehicle directly behind Mr. Taylor was atypical and further contributed to his suspicion of Mr. Taylor's impairment. *Id.* at 32:5–23.

Another trooper (Trooper Mitzak) then drove by both vehicles at a high rate of speed. MVR at 1:24:08–1:24:14. Mr. Taylor swerved over the fog line as Trooper Mitzak drove past him, MVR 1:24:16, and Troopers Clemons and McWilliams activated their vehicle's dash cam video at this time, 1:24 a.m., which then automatically captured footage from slightly over 30 seconds prior to the activation. Day 1 Tr. at 33:24–34:1, 34:6–11; MVR at 1:23:50–24:30. Mr. Taylor testified that he did not notice Troopers Clemons and McWilliams behind him until after Trooper Mitzak drove by. Day 2 Tr. at 78:19–79:2.

## II.     Failure to Stop

At approximately 1:25 a.m., Troopers Clemons and McWilliams activated their lights and siren to pull Mr. Taylor over. MVR at 1:25:03. After the troopers did so, Mr. Taylor traveled for nearly 2 minutes before stopping. *Id.* at 1:25:03–1:26:51. He slowed down at various intervals and swerved within his lane. *Id.* Although there are stretches where there was little room to pull over on the left shoulder, he also passed several stretches where there was sufficient room to pull over. *See id.* Mr. Taylor also moved his arms around in the front seat, although the footage does

not clearly show his movements. *Id.* Trooper Clemons saw Mr. Taylor moving around the center console area. Day 1 Tr. at 40:4–9.[6]

As Mr. Taylor slowed and swerved, Trooper McWilliams stated, "I think he's jacked up." MVR at 1:26:40. Trooper McWilliams testified that, by his words, he meant he thought Mr. Taylor was under the influence of alcohol or drugs. Day 2 Tr. at 21:9–18.

Mr. Taylor eventually slowed his vehicle to a stop, but failed to put the vehicle in park at first. MVR at 1:26:50. He stopped in the left lane without pulling over to the shoulder, although there was sufficient room on the shoulder to pull off of the road. MVR at 1:26:50. The troopers got out of their vehicle, concerned about conducting a traffic stop in the middle of the left lane on a dark highway. Day 1 Tr. at 44:22–45:8. Trooper McWilliams drew his taser as he approached the driver's side window and Trooper Clemons drew his firearm as he approached the passenger's side window. MVR at 1:27:03; Day 2 Tr. at 62:3–4.

## III.   Traffic Stop

As both troopers approached the vehicle, Mr. Taylor continued moving around in the passenger compartment near the center console. Day 1 Tr. at 47:6–10. Trooper Clemons yelled "don't [] reach" as he stood outside the vehicle. MVR at 1:27:16. Mr. Taylor continued moving

---

[6] The Court finds Trooper Clemons's testimony on this point credible. Mr. Taylor contends that he was instead waiving around his arms as he tried to figure out where the officers wanted him to pull over, based on his earlier contention that it was impossible to pull over given the lack of a shoulder on the bridge. Day 2 Tr. at 79:7–11. The Court finds this testimony not credible because the MVR footage shows sufficient space to pull over on the left side of the road by this point in the slow pursuit. MVR at 1:25:04–1:26:54.

Mr. Taylor also argues that, given his height of 5 feet and 3 inches, "he could not have moved around in the vehicle as described by" Trooper Clemons. Doc. No. 42, at 3. Mr. Taylor submitted a printout of the truck model. Def.'s Ex. 4. But, looking at this exhibit, Mr. Taylor's height certainly would not prevent him from at least trying to reach behind the console or dropping something behind the console. Thus, the Court is unpersuaded by this explanation.

his hands around in the passenger compartment of the vehicle as both troopers began yelling and telling him to stop reaching. Day 1 Tr. at 48:24–49:1.

Trooper McWilliams then pulled Mr. Taylor out the vehicle. MVR at 1:27:19–1:27:20. Trooper Clemons walked around and forced Mr. Taylor to the ground and handcuffed him. *Id.* at 1:27:24–1:27:37; Day 1 Tr. at 49:9-15. Both officers holstered their weapons after handcuffing Mr. Clemons. MVR at 1:27:30. Trooper Clemons observed that Mr. Taylor's eyes were bloodshot and his pupils were dilated. Day 1 Tr. at 52:13–23. As Trooper McWilliams retrieved a *Miranda* warnings booklet, Trooper Clemons told Mr. Taylor to "lay down, shut up." MVR at 1:29:29. Trooper Clemons then removed a headphone from Mr. Taylor's ear to ensure that Mr. Taylor could hear Trooper Clemons read his *Miranda* rights. MVR at 1:30:15–1:30:17; Day 1 Tr. at 50:20–24. Mr. Taylor did not ask for a lawyer or ask to end any questioning. Day 1 Tr. at 53:6-13. Mr. Taylor answered some but not all of the troopers' questions. *Id.* at 53:14–23.

Trooper Clemons also searched Mr. Taylor's person while he was in handcuffs on the ground, and discovered approximately $1,000 in cash in one of his pockets, 1:31:46–1:31:48, and two knives in Mr. Taylor's waistband, MVR at 1:33:54, 1:35:36; Day 1 Tr. at 49:14–18; 57:6–8.

After Trooper Clemons discovered the cash in Mr. Taylor's pocket, he prepared to do a more thorough search of Mr. Taylor's person, during which the following exchange took place:

| Trooper Clemons: | Easy, buddy, easy you got nothing that's gonna stab, stick, or poke us, right? Are you sure, dude? I want to help you out, bud, you seem like a good guy and if I get poked, I'm telling you, you don't want that to happen. You don't want me to get poked with a needle, okay? Do you have anything that's like PCP? Anything liquid that would, that could get on our skin? |
|---|---|
| Mr. Taylor: | Yeah. |
| Trooper Clemons: | Yeah? Where's it at? |
| Mr. Taylor: | I don't know. |
| Trooper Clemons: | Is it in the car? [grunt-like sound] Okay. How much PCP, do you need an ambulance here? [inaudible] He looks like he'd gonna OD or something. |

MVR at 1:32:49–1:33:18.[7]  Trooper Clemons asked Mr. Taylor whether there were any needles or

PCP because he did not want to get stuck with a needle and because PCP is a drug that comes in

the form of a liquid that can enter the human body through the skin.  Day 1 Tr. at 55:12–56:1.

## IV.    Search

As this questioning and search of Mr. Taylor's person were taking place, another

unidentified trooper moved Mr. Taylor's truck out of the left lane onto the shoulder because

leaving it in the left lane of the highway was not safe.  MVR at 1:32:50; Day 1 Tr. at 54:4–10; Day

2 Tr. at 70:2–6.  Around this time, Trooper Clemons and Trooper McWilliams also noticed a

chemical smell emanating from the vehicle that they associated with a drug known as "PCP."  Day

1 Tr. at 51:23–52:6; Day 2 Tr. at 69:25–71:4.  MVR at 1:32:32.[8]

Then, Trooper McWilliams looked in the truck and removed a gray bag (also referenced

as a backpack) from the rear floorboard.  MVR at 1:34:16; Day 2 Tr. at 70:7–10.  Trooper Clemons

---

[7]  Later, several minutes after the removal of the gray bag from the truck, Trooper Clemons asked about PCP again:

| Trooper Clemons: | You gonna tell me if you need medical help? |
| Mr. Taylor: | [inaudible] |
| Trooper Clemons: | Did you use PCP? |
| Mr. Taylor: | Yes. |
| Trooper Clemons: | Okay. How much did you use? Just like, did you, did you dip something in, or, |
| Mr. Taylor: | [inaudible noise] |
| Trooper Clemons: | What did you dip it in? |
| [no response] | |

MVR at 1:40:29–44.  Mr. Taylor contends that he answered "yes" to the first question, not the second.  The Court finds this explanation not credible given its review of the MVR footage and the timing of the questions and answer.  However, this exchange took place *after* the troopers searched the bag, so this issue is not relevant to the lawfulness of the search of the bag.

Mr. Taylor also disputes whether he declined a blood test later in his exchange with Trooper Clemons.  But reviewing the MVR footage, there is no audible response from Mr. Taylor in which he states that he is willing to take a blood test.  MVR at 1:57:58–1:58:49.  Again, this exchange took place after the search of the bag.

[8]  Mr. Taylor testified that the vehicle did not smell like PCP to him.  Day 2 Tr. at 96:20–97:6.  The Court, however, does not credit Mr. Taylor's self-serving testimony on this point.  Plus the MVR footage demonstrates the troopers' contemporaneous verbal observations about the PCP smell prior to Mr. Taylor's

stated "just be careful if it's PCP" after Trooper McWilliams retrieved the bag. MVR at 1:35:34–36. The gray bag contained various drugs, including PCP, acid strips, marijuana, and methamphetamine, as well as a firearm, packing material, and a scale. Day 1 Tr. at 58:14–25. Once the troopers discovered that the firearm had been reported stolen, they asked several questions about the firearm that Mr. Taylor did not answer. MVR at 1:46:52–1:47:22.

A tow truck then arrived to remove Mr. Taylor's truck from the side of the highway. Day 1 Tr. at 59:2–8; MVR at 2:01:24. Based on department policy regarding towed vehicles, Trooper Clemons completed an inventory search of the vehicle before it was towed. Day 1 Tr. at 60:17–25. He excluded some items from the inventory, such as an unopened bottle of tequila, an unopened box of cigarettes, and headphones. Day 1 Tr. at 68:24–69:6. The inventory search would have included the gray bag found in the truck. Day 1 Tr. at 60:22–25; Gov't Ex. 3.

Mr. Taylor now seeks to suppress the physical evidence the troopers recovered from the gray bag and his self-inculpatory statements.

DISCUSSION

Mr. Taylor contends that his traffic stop was unconstitutional under the Fourth Amendment because Troopers Clemons and McWilliams lacked reasonable suspicion for the traffic stop. As a result, Mr. Taylor argues the evidence discovered during the subsequent search of his vehicle is "fruit of the poisonous tree" that must be excluded. He also contends that admission of his self-inculpatory statements would violate his Fifth Amendment right against self-incrimination because the troopers did not ensure he understood his *Miranda* rights. The Government argues that the

---

admission and the subsequent search, which bolster their credibility that the vehicle did, in fact, smell like PCP.

warrantless search of the vehicle is justified by several exceptions to the warrant requirement and that Mr. Taylor implicitly waived his *Miranda* rights by selectively answering questions.

## I.   The Troopers Had Reasonable Suspicion for the *Terry* Stop

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend IV. As a general rule, a police officer must obtain a warrant supported by probable cause for a search or seizure to be reasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967); *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006). That general rule, however, is subject to numerous exceptions. As relevant here, an officer may conduct a brief investigatory stop (a seizure[9]) of an individual without arresting that person and even without probable cause so long as the officer, in light of his experience, has reasonable, articulable suspicion that "that criminal activity may be afoot." *Terry*, 392 U.S. at 30; *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Such a stop is now known colloquially as a "*Terry* stop."

Reasonable suspicion does not require "'rul[ing] out the possibility of innocent conduct.'" *United States v. Henley*, 941 F.3d 646, 653 (3d Cir. 2019) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). Still, an officer must have more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Terry*, 392 U.S. at 27. The officer's suspicion "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

The *Terry* reasonable suspicion standard also "applies to routine traffic stops" of vehicles. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006); *accord Michigan v. Long*, 463 U.S. 1032, 1047–48 (1983). "[A]n officer's Fourth Amendment burden of production is to (1) identify the ordinance or statute that he believed [was] violated, and (2) provide specific,

---

[9] A so-called "*Terry* stop" constitutes a seizure under the Fourth Amendment. *See United States v. Lowe*, 791 F.3d 424, 429 (3d Cir. 2015).

articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction." *Delfin-Colina*, 464 F.3d at 399. Because this is an objective determination based on the totality of the circumstances, the officer's subjective motivation is irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Yusuf*, 993 F.3d 167, 182 n.12 (3d Cir. 2021). In the traffic context, "any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).

A court reviewing an officer's determination "must look at the 'totality of the circumstances' of each case" to determine whether the officer had reasonable suspicion. *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Courts "give considerable deference to police officers' determinations of reasonable suspicion." *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014) (internal quotation marks omitted). "In fact, the officer's knowledge and experience with the type of criminal activity at issue is almost the focal point of the analysis and therefore must be given 'great deference.'" *United States v. Wilson*, No. 14-cr-209-1, 2016 WL 11642732, at *4 (E.D. Pa. Oct. 27, 2016), *aff'd*, 960 F.3d 136 (3d Cir. 2020) (quoting *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)).

For Fourth Amendment purposes, "the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (internal citation omitted). The Government must prove that the search or seizure was reasonable by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

The facts established at the suppression hearing lead to the conclusion that the Pennsylvania State Police troopers had reasonable suspicion to conduct a lawful *Terry* stop based on their observations of Mr. Taylor's speeding and impairment-related driving behavior.

*First*, driving in excess of the posted speed limit is a violation of Pennsylvania law. 75 Pa. Cons. Stat. § 3362. Trooper Clemons paced Mr. Taylor for at least three-tenths of a mile using a properly certified speedometer, as required by Pennsylvania law. 75 Pa. Cons. Stat. § 3368; *United States v. Gonzalez Segovia*, No. 18-cr-558, 2019 WL 3530910, at *8 (E.D. Pa. Aug. 2, 2019), *aff'd*, 858 F. App'x 589 (3d Cir. 2021); *see also* Def's Ex. 1, at 32 (speedometer certification).

Because the Court finds that Trooper Clemons and Trooper McWilliams clocked Mr. Taylor driving 75 miles per hour in a 55 miles-per-hour zone, which is a violation of Pennsylvania state law, the traffic stop was lawful. *See United States v. Garner*, 961 F.3d 264, 269 (3d Cir. 2020) ("[The officer] paced [the defendant] driving 75 miles per hour in a 55 mile per hour zone, so there is no dispute that the initial traffic stop was lawful.").

*Second,* Trooper Clemons also provided specific, articulable facts to support his reasonable suspicion that Mr. Taylor was driving under the influence. Mr. Taylor weaved, fluctuated speeds, and, by his own admission, did not notice the police officers following him as he continued to drive in the far-left lane on an empty three-lane highway. Trooper Clemons drew on his experience with night patrols to make a reasonable inference, based on the totality of the circumstances, that Mr. Taylor was impaired. *Givan*, 320 F.3d at 458; *see also United States v. Johnson*, 742 F. App'x 616, 618 (3d Cir. 2018) (noting that the state trooper reasonably suspected "that the driver lacked 'situational awareness' because he appeared not to have noticed [the] Trooper[]'s marked cruiser driving up behind him").

Impaired driving is a violation of Pennsylvania law. 75 Pa. Cons. Stat. § 3802. Therefore, the officers had reasonable suspicion to pull Mr. Taylor over based on this traffic code violation as well. *United States v. Wilson*, 960 F.3d 136, 145 (3d Cir. 2020).

In sum, the Court concludes Trooper Clemons and Trooper McWilliams had the requisite reasonable suspicion to conduct a lawful *Terry* stop of Mr. Taylor's vehicle.

## II.    Mr. Taylor's Self-Inculpatory Statements are Admissible

Mr. Taylor argues that his self-inculpatory statements about the PCP should be excluded because the troopers did not ensure that he understood his *Miranda* rights and ask whether he wished to waive them. There is no dispute that Trooper Clemons provided proper *Miranda* warnings before any of Mr. Taylor's admissions. Rather, Mr. Taylor argues that the Government has not shown a valid waiver of his rights.

The Supreme Court's ruling in "*Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). As such, the Court must consider whether Mr. Taylor made the self-inculpatory statements in a custodial interrogation setting and, if so, whether he waived those rights.

### A. Custodial Interrogation

The Court first considers whether Mr. Taylor's questioning was subject to *Miranda* requirements in the first place. "In determining whether an individual is in custody, the ultimate inquiry is: 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). To assess whether a defendant is in custody, courts in the Third Circuit consider a number of factors, including whether the officers told the

suspect he was free to leave or under arrest and whether his movement was physically restrained. *United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004); *see Leese*, 176 F.3d at 743–44. A person can be "in custody" for purposes of the Fifth Amendment, but not "under arrest" for purposes of the Fourth Amendment. *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984). But the inverse does not hold: once a person is formally under arrest, they are "in custody" for *Miranda* purposes. *Leese*, 176 F.3d at 743.

Here, the troopers did not tell Mr. Taylor that he was under arrest at any point during the encounter. Nonetheless, it is quite plain that Mr. Taylor was "in custody" for purposes of *Miranda*. Although the officers never told Mr. Taylor either that he was under arrest or free to leave, he was laying on the pavement on the side of a highway with handcuffs and surrounded by police officers. *Cf. Killingsworth*, 118 F. App'x at 651.

The Court finds that Mr. Taylor was under arrest by the time he began making self-inculpatory statements, even though the officers never said so explicitly. An officer may constitutionally arrest (seize) a person without a warrant, so long as that arrest is supported by probable cause. *Virginia v. Moore*, 553 U.S. 164, 171 (2008); *United States v. Watson*, 423 U.S. 411, 423–24 (1976). The timing of the arrest is a question of fact. *Sibron v. New York*, 392 U.S. 40, 67 (1968). A person is under arrest at the point a police officer "seized [him] and curtailed his freedom of movement on the basis of probable cause to believe that he was engaged in criminal activity." *Id.* Handcuffing a person immediately after a traffic stop to secure or investigate a location does not "automatically transform an otherwise-valid *Terry* stop into a full-blown arrest." *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010).

Here, the earliest an arrest took place was at the point Trooper Clemons read Mr. Taylor his *Miranda* warnings. While waiting for the *Miranda* booklet, Trooper Clemons told Mr. Taylor

to lay down and not speak. By the time Trooper Clemons read Mr. Taylor the *Miranda* warnings, a reasonable person in Mr. Taylor's position (even one arguably functionally impaired) would understand that the officers suspected criminal activity and that he was not free to leave.[10]

Indeed, Trooper Clemons had probable cause to believe Mr. Taylor committed the offense of driving under the influence. "Probable cause to make a DUI arrest is determined based on the totality of the circumstances and exists where the officer has knowledge of sufficient facts and circumstances to warrant a prudent person to believe that the driver has been driving under the influence of alcohol or a controlled substance." *Hall v. Raech*, 677 F. Supp. 2d 784, 797 (E.D. Pa. 2010) (internal quotation marks omitted). Probable cause exists if, based on the totality of the circumstances, there is a "fair probability" that the person committed an offense. *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2020). Put another way, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995).

The MVR footage shows Mr. Taylor swerving within his lane, slowing without stopping after the officers activated their lights and siren, failing to put his vehicle in park, and then stopping in the middle of the left lane despite sufficient room on the shoulder for him to pull over on a three-lane highway, in the middle of the night. Mr. Taylor's eyes were bloodshot and his pupils were dilated. Based on these facts, the troopers' reasonable suspicion that Mr. Taylor was an impaired driver had developed into probable cause by the time they handcuffed him and decided to read the

---

[10] Moreover, after this point, the officers began to search through the contents of Mr. Taylor's pockets. The search moved beyond a cursory *Terry* frisk, which generally only permits a limited pat down of outer clothing for weapons. *See Riley v. California*, 573 U.S. 373, 384 (2014); *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *Terry*, 392 U.S. at 30; *United States v. Yamba*, 506 F.3d 251, 258 (3d Cir. 2007). This fact, too, suggests that the officers themselves considered Mr. Taylor to be under arrest by this point.

*Miranda* rights. *Hall*, 677 F. Supp. 2d at 797.[11]  Based on the totality of the circumstances, there was a "fair probability" that Mr. Taylor operated a vehicle under the influence of drugs or alcohol. *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997).  The troopers, acting on probable cause, arrested Mr. Taylor for driving under the influence before beginning their questioning.

Thus, the Court finds that Mr. Taylor's freedom was sufficiently restrained to render him "in custody" for Fifth Amendment purposes by the time the officers started questioning him.  As such, Trooper Clemons's questioning constituted custodial interrogation.  *Rhode Island v. Innis*, 446 U.S. 291, 301 ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.");  *United States v. Braxton*, 99 F. Supp. 2d 567, 570 (E.D. Pa. 2000).

B. *Implicit Waiver of* Miranda *Rights*

Because there was a custodial interrogation, the key issue is whether Mr. Taylor waived his *Miranda* rights.  To establish a valid waiver of *Miranda* rights, the Government has the burden of showing that the waiver was "knowing, intelligent, and voluntary."  *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010).  The Supreme Court has explained that it is a "high standard of proof" to demonstrate a valid waiver of a constitutional right, on which the Government bears the burden. *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)).  A reviewing court must examine "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

---

[11] Although Mr. Taylor refutes whether he was impaired and testified that he had difficulty putting the vehicle in park as a result of the style of the rental truck's drive shaft, Day 2 Tr. at 79:15–17, this explanation is not relevant because the officers did not have knowledge of it at the time. *Hall*, 677 F. Supp. 2d at 797.  In any event, the Court does not find this explanation credible given Mr. Taylor's other driving behavior.

Mr. Taylor does not directly challenge whether his waiver was knowing and intelligent. Instead, Mr. Taylor makes a procedural argument, asserting that Trooper Clemons missed a "crucial step" in the *Miranda* warnings by failing to ask him if he understood his *Miranda* rights (and instead continuing directly onto his questions). But, while such a prophylactic step may provide further factual support that a suspect's waiver is knowing, technically there is no such requirement. *See Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010) ("[A]fter giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights.").

To determine whether a waiver is "knowing and intelligent," courts consider factors such as the defendant's age, language, and background, including prior experience with the criminal justice system. *United States v. Velasquez*, 885 F.2d 1076, 1087 (3d Cir. 1989); *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). Mr. Taylor was 47 years old in May 2020 and English is his first language. Def.'s Ex. 1, at 2. Mr. Taylor also had prior experience with the criminal justice system, including multiple prior convictions, with one for drug trafficking. Day 2 Tr. at 89:7–90:5. Thus, Mr. Taylor's background and experience support the conclusion that he understood his *Miranda* rights.

Theoretically, Mr. Taylor's indicia of impairment could call into question his ability to make an intelligent waiver. But Mr. Taylor did not introduce any evidence that he was too impaired to make a knowing and voluntary waiver of his rights. Instead, he testified that he was not impaired at all. *Id.* at 90:6–15. Considering the totality of the circumstances, the Court finds that Mr. Taylor's selective answers (*e.g.*, answering questions about PCP but not about the source of his firearm) support a finding of a knowing and intelligent waiver. *Berghuis*, 560 U.S. at 385–86 (finding that an implicit waiver was "confirmed by the fact that before then [the defendant] had

given sporadic answers to questions throughout the interrogation"); *see also United States v. Walker*, 607 F. App'x 247, 257 (4th Cir. 2015) (finding implied waiver where defendant was intoxicated but "not so intoxicated that he was not aware of his rights or did not understand them" and selectively answered questions).

Therefore, the Court finds that Mr. Taylor impliedly waived his *Miranda* rights and the admission of his self-inculpatory statements does not violate the Fifth Amendment.[12]

**III.    Evidence Obtained After the Self-Inculpatory Statements is Admissible**

Mr. Taylor also seeks to suppress the physical evidence from the gray bag that, he argues, was obtained as a result of an unlawful interrogation. The "fruits of the poisonous tree" doctrine does not apply to physical evidence obtained as a result of confessions made without *Miranda* warnings, as long as the confession was voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 163–64.

Mr. Taylor argues that the evidence found in the gray bag as a result of his admission about having PCP should be excluded because the admission was "obtained involuntarily." Doc. No. 21, at 19. In order to establish that a statement was involuntary so as to preclude evidence obtained based on the statement, there must be "coercive police activity," *Connelly*, 479 U.S. at 167, such that "the defendant's will was overborne when he confessed," *United States v. Walton*, 10 F.3d

---

[12] The Government also argues that, regardless of whether there was a *Miranda* waiver, the public safety exception to *Miranda* applies because Officer Clemons focused his questions on whether needles or drugs like PCP could harm an officer frisking Mr. Taylor. The Fifth Amendment and *Miranda* requirements do not preclude admissions when "police officers ask questions reasonably prompted by a concern for the public safety." *New York v. Quarles*, 467 U.S. 649, 656 (1984). Here, the Court finds that, in the alternative, the public safety exception would also permit the introduction of Mr. Taylor's PCP admission because Trooper Clemons's questions focused on obtaining information to protect the officers' safety. *See United States v. King*, 182 F. App'x 88, 91 (3d Cir. 2006) (finding that the public safety exception applied where the "primary objective" of the officers' questions was "to obtain safety information from Defendant before law enforcement personnel entered the potentially dangerous clandestine methamphetamine laboratory and the questions [they] asked Defendant were consistent with this goal"); *United States v. Liddell*, 517 F.3d 1007, 1010 (8th Cir. 2008).

1024, 1028 (3d Cir. 1993) (internal quotation marks omitted).  Examples of coercive tactics include prolonged, multi-hour interrogations, threats of physical violence, and deprivation of food or water during detention. *Colorado*, 479 U.S. at 163–64 & n.1 (collecting cases).  The Government has the burden of proving that the statement was made voluntarily. *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994).

Here, Mr. Taylor asserts that the fact that he was handcuffed and laying on the ground was coercive.  Doc. No. 21, at 19.  However, this is not evidence of coercive activity sufficient to overcome Mr. Taylor's will. *See United States v. Latz*, 162 F. App'x 113, 118 (3d Cir. 2005) (finding no coercion where suspect was handcuffed and officer may have been holding a shotgun).  By the time Trooper Clemons handcuffed Mr. Taylor and read the *Miranda* rights, the situation had de-escalated.  Trooper Clemons did not have a weapon pointed at Mr. Taylor nor did Trooper Clemons physically threaten Mr. Taylor.  Trooper Clemons asked a short series of questions in a conversational, matter-of-fact tone.  This is not coercive police conduct that overcame Mr. Taylor's free will. *See Berghuis*, 560 U.S. at 387 (finding that three-hour interrogation was not "inherently coercive" because "even where interrogations of greater duration were held to be improper, they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats").

Mr. Taylor's subsequent refusal to answer questions about the stolen firearm also demonstrates that his will was not "overborne" during Trooper Clemons's questioning. *Walton*, 10 F.3d at 1028.  Rather, Mr. Taylor felt free to, and occasionally did, choose not to answer particular questions.  Therefore, the Court finds that Mr. Taylor's self-inculpatory statements were voluntary and any evidence found as a result of those statements is not precluded on this basis.

IV.    **The Automobile Exception Applies to the Vehicle Search**

Lastly, Mr. Taylor challenges the search of his vehicle without a warrant.  The Government argues that the automobile exception renders the search lawful.[13]   The automobile exception permits police to search a vehicle without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Donahue*, 764 F.3d 293, 299–300 (3d Cir. 2014) (internal quotation marks omitted).  Under this exception, there are no restrictions on which portions of the vehicle may be searched (including opening containers) and the Court need not consider whether the defendant was immobilized. *Id.* at 300.  Instead, officers are only limited by the requirement that the search be confined to the parts of the vehicle and the contents therein "that may conceal the object of the search." *Id.*  To determine whether there was probable cause for the vehicle search, the Court evaluates whether the "historical facts, viewed from the standpoint of an objectively reasonable police officer" support a "fair probability" that the vehicle contained evidence of the crime, based on the totality of the circumstances at the time the officers conducted the search. *Id.* at 301.

Here, the officers had developed probable cause that Mr. Taylor's vehicle might contain evidence of a crime from at least three separate sources.

*First*, as already discussed at length, the officers had probable cause to suspect Mr. Taylor of driving under the influence based on their observation of his driving, including his swerving, erratic speed, and failure to notice a police car behind him while he remained in the far-left lane of an otherwise empty three-lane highway at approximately 1:20 a.m. This gave the officers probable cause to believe they may find contraband in his vehicle, such as open containers of

---

[13]  The Government also raises the warrant exception for a search incident to arrest.  However, the Court need not reach this exception because the automobile exception renders the search lawful.

alcohol or other drugs. *See, e.g.*, *United States v. Kennedy*, 13-cr-240, 2014 WL 6090409, at * 14 (W.D. Pa. Nov. 13, 2014) (upholding discovery of evidence during search of vehicle for marijuana where officers had probable cause to believe suspect was driving under the influence).

*Second*, Mr. Taylor's admissions after the officers removed him from the vehicle also gave them probable cause to believe that there may be evidence of a crime in Mr. Taylor's vehicle. *See United States v. Harris*, 403 U.S. 573, 583 (1971) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search."). Mr. Taylor's responses to the officers' questions indicated that there was PCP in the vehicle. This, too, provided probable cause for the troopers to believe that the vehicle contained evidence of a crime.

*Third*, the officers smelled the odor of PCP emanating from Mr. Taylor's vehicle after they stopped him. Based on the officers' training and experience, the smell of the illegal drugs, too, provided probable cause that Mr. Taylor's vehicle contained evidence of a crime. *See United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006); *United States v. Hutchinson*, 471 F. Supp. 2d 497, 509 (M.D. Pa. 2007) (describing the "plain smell" doctrine); *Johnson v. Anhorn*, 416 F. Supp. 2d 338, 372 (E.D. Pa. 2006). Indeed, the "distinctive odor of PCP, alone, can establish probable cause to search the place from which the smell is emanating." *United States v. Smith*, 373 F. Supp. 3d 223, 242 (D.D.C. 2019). Here, the troopers both testified that they smelled the PCP emanating from the vehicle. That smell was the basis for Trooper Clemons questioning Mr. Taylor specifically whether he had PCP, as opposed to any other drug. Therefore, the smell also independently provided probable cause for the troopers to search the vehicle.

In sum, Mr. Taylor's driving, Mr. Taylor's admissions, and the smell of PCP emanating from Mr. Taylor's vehicle each independently provided probable cause to believe that Mr. Taylor's

vehicle contained PCP. Under the independent source doctrine, any one of these bases would permit even an otherwise-unlawful search. *See Utah v. Strieff*, 579 U.S. 232, 238 (2016) ("[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source."). Therefore, the automobile exception applies to permit the warrantless search of Mr. Taylor's vehicle.

## V. Even if the Automobile Exception Did Not Apply, the Inevitable Discovery Exception Would Allow Admission of the Bag's Contents

The Government also argues, in the alternative, that even if the automobile exception did not apply and the search of Mr. Taylor's vehicle was unlawful, the inevitable discovery exception to the exclusionary rule would apply so as to make the evidence discovered inside Mr. Taylor's vehicle admissible. "Under the inevitable discovery doctrine, if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means," then the evidence is admissible. *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (internal quotation marks omitted). "The Government can meet its burden by establishing that the police, following routine procedures, would inevitably have uncovered the evidence." *Id.* (internal quotation marks omitted). This requires "historical facts capable of ready verification, not speculation." *Id.* (internal quotation marks omitted)

The Government argues that the vehicle would have been lawfully inventoried regardless of the earlier search because of the tow of Mr. Taylor's vehicle when Mr. Taylor was taken into custody. *See Colorado v. Bertine*, 479 U.S. 367, 371 (1987) ("[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment."); Gov't Ex. 3 (inventory policy). Pennsylvania State Police policy requires an inventory of a vehicle's items when the vehicle is involved in an "unusual highway event," which includes an "incident in which the occupant[] is taken into custody." Gov't Ex. 3 § 9.03(B)(3). The inventory search would have

included an inventory of the gray bag because it was located in the passenger compartment of the vehicle. Gov't Ex. 3 § 9.04(B)(4).

Mr. Taylor argues that the troopers did not properly inventory items in the truck pursuant to department procedures because they decided not to include certain items such as the unopened tequila bottle and headphones in the inventory. But Mr. Taylor does not provide a reason why this selective listing would render the inevitable discovery doctrine inapplicable. The doctrine applies to inevitable *discovery*, not inevitable cataloging. The issue is whether the evidence "would have inevitably been discovered" absent a prior unlawful search. *United States v. Bradley*, 959 F.3d 551, 557 (3d Cir. 2020). During the inventory search, Trooper Clemons found the headphones and other items just as he would have found Mr. Taylor's bag. According to Pennsylvania State Police policy, officers should inventory "[p]ersonal items, in plain view, within the passenger compartment of [the] involved vehicle." Gov't Ex. 3 § 9.03(B)(4). Thus, there is no question that the officers would have inevitably discovered Mr. Taylor's bag in the passenger compartment and searched it as part of their inventory of the vehicle. *Cf. Bradley*, 959 F.3d at 558. Mr. Taylor's argument about selective cataloging is simply not relevant.

Mr. Taylor also argues that the inventory search would not have happened but for the unlawful traffic stop and arrest. The Court has already found that the *Terry* stop was lawful for the reasons discussed above. Additionally, there was probable cause to arrest Mr. Taylor and thus, to tow his vehicle pursuant to department policy and conduct the inventory search. As a result, the inevitable discovery doctrine would permit the admission of the bag contents even if the automobile exception did not apply.

**CONCLUSION**

For the foregoing reasons, the Court denies Mr. Taylor's motion to suppress in full.  An appropriate Order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE